May it please the Court, Joseph DePalma for Plaintiff Edward Lamb and others. I request five minutes of rebuttal time. Okay, fine. Thank you. Title insurance companies in New Jersey have operated in an under-regulated and under-enforced environment for decades to the public's detriment. Under-regulated does not mean unregulated, though. Under-regulated does not mean unregulated, for sure. And I will get into, in a moment, the structure, which I think is the foundation of the non-judiciability prong of the filed-rate doctrine. The District Court erred when, instead of taking these factors into consideration, it held that the filed-rate doctrine applies automatically any time rates are filed. This appeal is about whether there must be some rationale for applying the filed-rate doctrine beyond the mere filing of rates for the first time to a particular industry. If that's not the way the rule operates, how would it operate? In answering that question, how would you imagine the rule operating in a regime where the federal court was not acting as a corollary to the state regulatory agency? I'm not sure I asked that very clearly, but do you understand the first question? I think I do. The case law is clear that the filed-rate doctrine has been extended, if applicable, to state schemes. So, although we have in our complaint a count under the New Jersey antitrust statute, the federal filed-rate doctrine does apply to each of those schemes. The rule announced by the District Court, if adopted here, would make one of the more roundly criticized federal common-law doctrines virtually unassailable. To create that automatic rule, if you file, it applies, makes challenge impossible. If you file and the rates are approved, it applies. Exactly. Exactly. Non-justiciability brings these two points into focus, the under-regulation and the under-enforcement. Didn't the court basically say that, and I think it was in square D, maybe I'm wrong about that, in terms of the case, but didn't the court basically say that if there's a state regulatory scheme in place and they approve filed rates that, you used the word unassailable, that those rates then, that a federal court can't come in and second-guess the regulatory agency and say that the rates are either unfair or discriminatory? Exactly. Well, what's wrong with that? Let's get to the very bottom of this. The Supreme Court has decided this case many years ago, and then in square D, it decided it again. We are an inferior court. That's what the Constitution says. Why shouldn't we be bound by what the Supreme Court said? You must be bound by what the Supreme Court says, but this question... And therefore, why should we allow this kind of challenge to take place? The Supreme Court in square D had before it an issue of whether to extend the Keogh Doctrine in the context of the Interstate Commerce Act. It spoke very carefully about the intersection of the antitrust laws and the Interstate Commerce Act, and the crux of the square D decision wasn't whether to extend the doctrine automatically to new industries where there's no stare decisis concerns. It was whether in the context of the ICA, Keogh should still apply even though there was no hearing as there had been in the underlying Keogh case. Yeah, but what difference does that make? I mean, the Supreme Court had it right before it, and it didn't move back from Keogh. Why should we be an outlier and just say it doesn't apply? It didn't. I mean, there are good reasons why it shouldn't. Judge Friendly, for example, was the leading group of people who objected. But they didn't do it, and isn't that all that we're left with? Certainly that's the crux of the issue here, whether to hold that the doctrine applies automatically without respect to any rationale or purpose behind it, or whether if there is no stare decisis concern because it's the first time the doctrine is being asked to apply to a new industry, there must be some principled reason to apply it. All the cases, including square D, talk about the two underlying strands of the doctrine. How many jurisdictions have actually held as you are asking us to hold? What is your precedent? The Ninth Circuit. Well, wait, didn't you say the Ninth Circuit? Just the Ninth. And state court cases. The Ninth Circuit, you rely upon three cases. Of those three, Brown was really the only one that discussed the doctrine. And Brown, really, even in terms of the Ninth Circuit's own jurisprudence, seems to be an outlier. The other two cases really didn't get into the five-rule doctrine. So you're really talking about one case. We're talking about one case. And essentially we're really backing to square D. Square D, I think everyone agrees, is the intersection of the whole appeal. Well, Keogh, really. I mean, you start at the beginning. Right, right. I mean, you don't have to start at square D. I mean, square D didn't start it. Here's, I think, Judge Sloveder, the point to be made on square D. It recognized the salutary purposes of the antitrust laws. It recognized that exemptions are to be narrowly construed. It was critical, at least acknowledging Judge Friendly's criticism of the file rate doctrine. It never mentioned in the opinion that the doctrine was intended to extend to all industries automatically. Instead, it spoke specifically about the fact that Congress, in the six-and-a-half decades since Keogh to square D, made repeated, not repeated, but amended the ICA several times and knew of Keogh's existence and chose not to disturb it. Well, isn't that itself determinative? It's determinative in the context of the ICA. It's determinative in the context of if a court finds, for other reasons, telecommunications or utilities, there are the principles that are present and the doctrine is held to apply. The effect of the doctrine is that consumers are out of luck. There is no challenge. Well, I think you have an uphill battle. I'm just wondering what you think your best argument is. There really isn't much support for it. Your Honor, let me get right to the crux of it. I guess you'd better. The cornerstone of non-justiciability has to be structure. It's implicit in all the cases. Without an adequate regulatory structure, there shouldn't be a displacement of the antitrust laws in favor of a regulatory scheme that doesn't work. And what's your best case for that proposition? The New Jersey legislature did not intend to establish a regulatory scheme involving title insurance without regulations promulgated by the Commissioner of Banking and Insurance. But, you know, that's exactly where the issue is. If there is to be a change, it should be a legislative change. And the New Jersey legislature hasn't imposed a change in this field. So why should we as a court, and as some say an undemocratic court, make a change? Because we're talking about displacing one of the more fundamental economic doctrines in our law, the antitrust laws, in favor of a regulatory scheme. And if that scheme… We're not really displacing it. We're trying to determine its proper application. And the court said in Keogh, the trial rate doctrine doesn't create immunity from antitrust liability. It simply limits the right of private individuals to get third trouble damages. And there's an injunction issue. There are two you might want to press. My concern is… Excuse me. I understand what you're saying about justiciability. But I don't see any way that we could displace the doctrine. And I think you're relying primarily on the language of footnote 19 in square D. If that's what the footnote says, and it seems to me the footnote there is saying that Keogh cannot be interpreted as narrowly as you want us to interpret it, how do we not displace the state regulatory apparatus? Because your argument would lead unalterably to us having to look behind the curtain, if you will, and look at the quality of the state regulatory review. And if we determine that the state regulatory review was not adequate or the consumer didn't have enough opportunity to challenge rates, then we would step in and say rates that the state determined were fair, reasonable, and non-discriminatory, we'd have to displace that and say no state regulatory agency in whose expertise we should be deferring to. You're wrong. These rates are discriminatory. And my problem with your argument is I don't know how to get around that conundrum. Doing away with the doctrine in this context seems to me that we then displace the Commissioner of Insurance, where that's the regulatory authority, or the Commissioner of Banking, if that's the regulatory agency, and the federal court then determines the reasonableness and the applicability and the appropriateness of the rate. And that's the whole reason for the doctrine being there in the first place. Chief Judge McKee, I don't think that the issue is as complicated as you've expressed. If the legislature in New Jersey said to the Commissioner of Banking and Insurance, here's the statute. It's enough. Go regulate. Or if the legislature said here's the statute, if in your judgment you think you need regulations, go and promulgate them. Why didn't they do that? I thought that's what they did. New Jersey did not. New Jersey has two provisions in the Title Insurance Act, in Section 40 and in Section 49, where the legislature of New Jersey commanded, mandated the Commissioner to promulgate regulations, to put meat on the skeleton. It is not the intent of the legislature that this Title Insurance Act was to be in place without regulations. And because of that, it is not being regulated pursuant to declared standards of state policy. But it's not being regulated the way you would like it regulated, the way some people would like it regulated. But it is being regulated. The purpose of the Title Insurance Act, I think, illuminates in answer to your question, Judge Sloviner. The purpose of the Act in Section 41 is to promote and protect the public welfare, and it's to be liberally construed. And it will not be the first statute that doesn't fully accomplish that. Right. But so what? The reason is because without – let me take a step back with Square D. Certainly if Square D is to be determined to be an automatic application of the doctrine any time rates are filed, then there's no reason to talk about in the cases just disability or discrimination. It's like a button. Well, there's a rationale for the doctrine at its foundation. There is. And the rationale was, at least in Square D, that KEO should continue to apply. Okay. The rationale for the doctrine in telecommunications and in utilities. But we're not in – I mean, that may be, but we're not in those right now. We are in insurance, title insurance. In fact, there's a policy on my desk upstairs for various reasons, personal reasons, for title insurance. So why should we jump to those? I mean, that's what the Supreme Court has said. That's what we do. I really don't understand your basis for going beyond that. My basis is that I believe when you look at Square D and you strip away stare decisis, nothing is left of the opinion, certainly nothing is in the opinion, nothing, that says that the doctrine is to apply automatically without regard to underlying rationale or principle to a new industry. The case is – Well, what is the new industry? Title insurance is not a new industry. This is a very, very old industry. I could have probably chosen a better word. Title insurance in New Jersey has never been the subject of a case like this where a court is being asked whether the filed-rate doctrine applies. There is no case like there is in telecommunications or in utilities that has gone through the process of determining whether the underlying strands of the doctrine are present. Here we have a blank slate, and our argument is – Well, we – excuse me, but we don't have a blank slate. We have a decision. We have Keogh. That's not a blank slate. Keogh is not a blank slate. It means what it says. Yes. And what it says is that if, in my view, if the non-just – if a case invokes either the non-justiciability or non-discrimination strands of the filed-rate doctrine, the doctrine applies. We all know what the effects of the doctrine are. They're very draconian. We're not here to argue that Keogh or Square D should be overruled or there should be exceptions to the – Seems to me that's exactly what you're arguing, with all due respect. I'm not articulating it as clearly as I can then. It's not your fault. I just think that that's the situation that you're in. You may have been held – you've got to play the hand you're dealt, but you weren't dealt the best hand of cards. But that is the effect of your argument, isn't it, that Keogh is – if I understand your argument, you're saying that Keogh and Square D are fine, but that applied to an industry that was subsequently bossed by the ICA. They went along in Square D with Keogh because of stare decisis. This is a new industry where stare decisis doesn't automatically import the rule, so we have to look at the two strands that support the rule. But I get stuck there because even looking at the two strands, even if I accept that, it seems to me the basis for the rule applies with full force to title insurance unless we accept your argument about the business of insurance. Maybe you should go there because if you're right there, then – Let me – I do have a question to ask in between, though. Have you people tried challenging the defendant's title insurance rates in a formal administrative hearing? No. New Jersey title, as I said, has an insufficient structure. There is no mandate – Therefore, there's no way in which you could challenge it if you decided to do so? A member – a citizen in New Jersey who purchased title insurance can approach a commissioner, and a commissioner within a 30-day period could determine if the application was filed in good faith, and if so, it could act on it. Isn't that a way to challenge them? You haven't tried that. It is a way, but it is not the only way. Yeah, but if it's a way that might reach to the result you would like, why didn't you try that way? Because we believe that the Antitrust Act contains the proper basis to provide a remedy, not a commissioner who we know from the record has done nothing since 1975, or commissioners in sequence have done nothing. We have to remember, too, that it isn't just our case that's critical of the fact that there's no regulatory structure in place, that there's no regulations at all. So this is, I think, an easier call than any other state when you're looking at structure. We'll get to the other state shortly. Exactly. This is an easier call because no regulations have been promulgated pursuant to the Act. So you have a commissioner, you have a department that has ignored the will of the legislative body. When we talk – Excuse me for interrupting, but if the legislative body really wanted to do something, they would just get together and come up with a new scheme, and they haven't. So the legislative body hasn't really shown any interest in doing that. It doesn't mean that the public doesn't have an interest. If the legislative body doesn't have it, I don't think that that's – which the public wants. But if it hasn't done it for all these years, I doubt that there's much want behind it. You know, the whole – this is like FTC versus Tycor redo right here. I think the whole issue, as that case went to the Supreme Court through this circuit, was this tension between, well, is the structure enough? Is it enough to give the commissioner authority and power to actively supervise? Or is there something that's needed beyond it? And what I'm arguing here is we don't even have an adequate structure in place. And the reason we don't have an adequate structure in place is because the State of New Jersey did not intend that title insurance will be regulated in the way it's being regulated. This is, I think, an easy call. I think that when you have a mandate – That's right. You lost me there. Why – what are you basing that on? These rates are consistent with the state regulatory scheme, aren't they? No. They're not? The rates – well, there's two parts to the question. The rates have been approved. But the regulatory scheme – And there was a hearing, wasn't there? There was – it's questionable whether there's a hearing. There was a submission, and there are letters in the record saying that the commissioner has approved the rates. So there's a record. Right. Okay. So what more do you want? What is needed in New Jersey is what the state legislature mandated. They said that it shall be the duty of the commissioner to promulgate regulations. That is a very critical fact, and that goes to – Well, then maybe you ought to be talking to the legislative committees. I mean, it seems to me you're in the wrong forum today. Well, I believe that – In light of the filed rate doctrine and the precedents that we have, you're asking this court to go out beyond what other courts have done so far and to get into this whole doctrine. And I just think your better approach is probably with the legislature. Justice O'Connor, certainly if a citizen has several approaches available to him or her, it isn't improper to choose one over the other. Perhaps not, but it isn't improper for the court to say you're in the wrong place either. The issue, I believe, in New Jersey is so fundamental and so fundamentally deficient that it hasn't come up in other cases. Where in Wigoland, in Square D, in the telecommunications cases, there's an implicit acknowledgement that the scheme in place was created pursuant to legislative intent. We don't have that. I don't want to belabor that point. But you lose me with that point because you did say that rates were filed pursuant to the statute in place. Rates were approved, and we have to take that from that. They were deemed to be fair and reasonable and non-discriminatory. But then you go beyond – and I think you concede that. But then you go beyond that and say you suggest that somehow these are illegal rates under state law. And I don't know where you're getting at. I don't believe I need to suggest that the Commission is actuating ultra vires. What I'm suggesting is that Square D's rationale should apply to a new industry if the underlying strands are present. What I'm arguing is that the underlying strands are not present here for several reasons. More are in the brief, but we're focusing here on, I think, the most essential one. Because there is a structure in place that was not created pursuant to the will of the legislature, the non-justiciability strand cannot be implicated. Mr. DePalma, I know you probably want to spend a little bit of your time on the business of insurance. I sure do. Why don't you do that? Because what would be left if the file rate doctrine does apply, obviously, would be injunctive relief. So it's important, I think, to spend a few minutes on McCarran-Ferguson. Very quickly, we've made an argument in the brief, and I don't want to spend time here, that title insurance isn't insurance. So if, in fact, it's not insurance, McCarran-Ferguson doesn't apply at all. But let me just assume that it is insurance for the sake of this argument. There's two things I think we need to look at. The purpose of McCarran-Ferguson, and we need to focus on the activity that we are centering our litigation on. The purpose of the McCarran-Ferguson doctrine, obviously, is to provide a limited immunity to protect the sharing of lost information. Congress recognized the need for insurance companies to be able to pool that kind of information, to share it so they could properly annuitize risk and be able to better underwrite policies. Now, that, I think, illuminates the issue of the activity. The activity here is a pure and simple price fix. Price fix. It's a pure and simple price fix. The activity, in order for it to qualify as the business of insurance, under Royal Drug and Perino and insurance brokers, must have the practice and effect of spreading and transferring of risk. We know... You concede in your complaint that some of that takes place, right? That goes to the issue of is it insurance, and, you know, if... Well, if it's insurance, it has to be risk-taking, yeah. I see it in your brief, too. I think page 39 you concede it. Right. But in all of the McCarran-Ferguson cases, you're dealing with insurance. I mean, we make a separate argument that title insurance is really an indemnification or warranty, but I'm putting that aside for the moment. It's insurance for the purpose of this argument under McCarran. McCarran makes... Royal Drug makes plain, insurance brokers make plain, that it is the activity that's the focus when you're looking at what is the business of insurance. And we say that the activity here, getting into a room, the rate-making room, and sitting down and never talking about underwriting, never talking about annuitization, never pooling statistical data, and simply sitting and saying we want to increase the title insurance rates doesn't include any conduct that involves risk-spreading or risk-transfer. And there's a lot of support for that assertion. We have findings of fact that were made by the administrative law judge in FTC v. Tycor where those findings said exactly that. No evidence whatsoever, not a whit of evidence, that any of this took place. We know in the Supreme Court case... Your light is on. Did you reserve time? I'm not sure if you did or not. Well, you can't reserve time. I'm sorry. I did reserve five minutes, but my red light is on. Okay. Do you want me to go ahead? Isn't his red light on? It did come on. Didn't his light come on? His light came on, didn't it? Yeah. All right. I think we've given you your time. Thank you. Thank you. Thank you. May it please the Court, my name is James Sirota. On behalf of the First American, the appellees, and the other defendant appellees, I will defend this appeal. This is one of 78 cases filed in 12 jurisdictions around the country, all alleging the same thing. So that a lot of people think you're not doing the right thing, right? A lot of people were wrong because every one of those cases has been dismissed. And where appeals were taken in the Second and Fifth Circuit, they were affirmed on the Fouled Rate Doctrine. So up until now, everyone agrees that what we did was correct. I propose to discuss the McCarran Act, but first, if you would, I would like to answer any questions that you might have regarding Fouled Rate Doctrine. Frankly, in listening to the exchange between the appellant and this Court, I believe you have it exactly right. This is a challenge. This is essentially a political question. They would prefer to go to court rather than challenge what they think is the efficiency or lack of efficacy of the title insurance rating process in New Jersey. Frankly, I think they have it all wrong. I would note just in passing. Frankly, they probably have it right, but that's not the issue. The issue is not what's right. The issue is what is the law. And the law in Square D is clear that once the rate has been filed, and I don't mean by that the proposed rate. The process is we propose a rate. The superintendent of insurance must make an affirmative declaration, a finding that based upon the standard, and the standard is set forth in Section 1746B, Sections 42 to 45. The standard is the rates must not be unreasonably high, must not be unfairly discriminatory, and must take consideration for the soundness and financial solvency of the insurers. I'm sure they take a lot of consideration of the financial solvency of the insurers, but I'm not sure that that does the whole job, does it? In terms of their review, it does the whole job according to the standard, which is dictated by the New Jersey State Legislature. Has anybody ever compared the title insurance rates in New Jersey with those of other states? I'm not aware of a comparison, although there is a National Association of Insurance Commissioners, and they have access to all the filings that are made across the United States regarding title insurance rates. And how does it come out? I don't know what the answer to that is. The point simply is that there is a standard. The standard is a standard which is determined by the New Jersey State Legislature, and the superintendent before allowing these rates to be filed must approve those rates according to that standard. You should just note in passing, and I don't think they've ever challenged the fact, that with respect to all of these rate filings, it's simply the case that we rarely, if ever, have received what we've asked for. Is that in the record? Pardon me? Is that in the record? Of course. It's in Exhibits A to O through the, I believe it's Appendix 90 through 160, which indicate all the filings which we've made and the orders of the New Jersey Superintendent of Business and Insurance. Yes, you were about to ask a question. I'm sorry. No, no. All right, fine. You're saying that the commissioner brings it down? Historically, you'll ask for a particular rate, and the rate is approved to somewhat less than you've asked for? That's historically the pattern, correct. As to the question of regulation, that's not a mandatory requirement that you have regulation, and frankly, in view of the standards which are specifically set forth in Sections 42 to 45, I don't really see the necessity for it, and obviously, historically, the superintendent agrees with that. I'd like to address the McCarran-Ferguson Act, if you will. In 19th, this is a case where, under the Perino standards, you must meet four tests. One, spreading of underwriting of risk. Two, it must invoke the policyholder-insurer relationship. There must not be entities involved outside the insurance industry. And fourth, it must be subject to state regulation. If I could start out of order, because they're alleging that there are entities here outside the relationship, and specifically what they're calling kickbacks to brokers and people involved in the overall real estate transaction. They're not – if you would look at – we would not agree with that characterization, but to the extent that they're referring to relationships with policy agents, as this court has held in the insurance brokerage and trust litigation – I'm sorry, the insurance brokerage MDL litigation, the marketing costs and so forth and communications with policy agents are within the scope of the McCarran-Ferguson Act. So that's clearly something that's contemplated. This is not like Perino, where we're talking about doctors who are passing upon some aspect of the insurance relationship. These are solely entities within the insurance industry. The fact is they don't contest that there's state regulation, that's subject to state regulation. They don't contest that there are entities that are outside the insurance industry. They don't contest that it's not a policyholder-insurer relationship. And, in fact, as Your Honor pointed out in paragraph 38 of the complaint, they concede that 5 percent or less of the premium is paid out every year. So they concede that, in fact, there has been a risk, the risk has been accepted, and the risk has been spread. What they question is how much risk would qualify for insurance. I don't think there's ever been a test that says that you have to have a certain amount of risk in order to qualify for insurance. Frankly, if one looks at the state of New Jersey, the state of New Jersey policy decision is to the contrary. The state of New Jersey has stated that before you write a policy of insurance, you must do a search and examination. It is reckless and against the public interest to write title insurance on a risk-only basis. And we don't do that. I would note just in passing there's a separate charge for title, for search and examination, and that's not at issue in this case. What SEC v. Variable Annuity says is very clear. There's either risk or there's no risk. Here there is risk. The risk has been assumed. And the plaintiffs are basically asking this court to make a value judgment that there should be more risk. As the court noted below, from the perspective of the policyholder, if a claim comes in, that's a substantial risk. So one cannot equate the- Irrespective of the amount? Sure. Let me just give an example. The risk, this court is fully aware that over the last 40 years there has been substantial litigation, and it's gone back and forth within this circuit, the Supreme Court, and back several times involving Indian claims litigation. Those were unforeseen. Not so much in this circuit. That's mostly out west. We don't have many Indian- Actually, it has. It's involved cases in this circuit, also in the Second Circuit, all involving Indians within one involving Bethlehem Steel Plant, one involving in New York State. But the point is simply this. These were unforeseen risks which could not have been discovered, and homeowners bought policies, and these are policies which-they're not warranties. If you look at your policy, you'll not see an attorney's statement of good and merchantable title. It's an insurance policy, and the insurance policy says very clearly, we will, in the event that certain events occur, subject to certain exceptions, we will defend that policy, and if we lose that defense, we will settle up to the amount of that policy. So it is an insurance policy. It is nothing other than that. And the point is simply this, that when those, for example, those Indian claims came about, no one possibly would have contemplated that the amount of premiums which were paid for title insurance would have incurred the kinds of defense costs and potential losses that those policies invoked. The point is that in title insurance, when you buy it, you're exposed for a long, long time. It isn't like a car insurance where you buy it annually, and you know what the-you're either going to find a risk that's going to come due that year or not. You have a risk which you-which for as long as you own that policy or until you refinance, you are exposed for that risk. So the amount of payment of claims does not correlate with the risk which is assumed. The risk can be very large in relation to the amount of premiums paid. McCarran-Ferguson is a complete and total bar to this case. So is filed rate, but both of them independently are complete and total bars to this case. Do we have to get into McCarran-Ferguson if we go-if we think the filed rate doctrine is an adequate response? If you think it's adequate, you don't have to reach McCarran-Ferguson. Absolutely correct. That's not taking care of any aspect of it? No. If you believe that McCarran-that filed rate is a complete limitation of remedy in this case, then you need not reach McCarran. The court below-and I would point out as to the New Jersey claims, there's a New Jersey corollary both on filed rate, and the New Jersey Supreme Court has approved filed rate below in the Richardson case, in the Santomino case, and the Weinberg case. The New Jersey law in this-basically the federal law is the same? Exactly the same. And as to the-there's insurance exemption. The insurance exemption in the New Jersey Antitrust case is wider than that of the McCarran-Ferguson. It's the one proposing rejecting a royal drug. It applies to the activities of insurers that are subject to state-subject to regulation.  And this is clearly an activity of an insurer, an activity of a rating bureau. Let me just point out, just in passing on McCarran, what is at stake here is this is pure cooperative rate making as contemplated by the Congress in McCarran-Ferguson when it overruled Southeastern Underwriters. Southeastern Underwriters was a rating bureau. It was a rating bureau where people gathered information, they jointly determined rates, and they jointly filed rates. That's exactly what's happened here. Isn't that really just price-fixing, though? Pardon me? Isn't that really just price-fixing? I mean, aren't the plaintiffs right when they say that all these rating bureaus are just fixing prices? If it's price-fixing, I would call it collective rate making. Well, whatever you call it. Whatever you would want to call it. Whatever you want to call it, it is an exemption from the antitrust laws as contemplated by the Congress in 1945, and giving the states an option to implement regulation to take up that option. New Jersey took up that option. So, yes, this is a regulated industry, and the very fact when you're dealing with a regulated industry is it's a determination that that particular jurisdiction has decided that rates will be determined under its supervision, under its laws, as opposed to the marketplace, and that's exactly what you have here. Unless you have further questions. No, I think we've done it. Thank you. Thank you. You're very welcome. Just a couple of points. Go ahead. I'm sorry, yes. There are rating bureaus that don't involve price-fixing. Speak up, please. I'm sorry. Everybody wants to hear what you have to say. Sorry. There are rating bureaus in other insurance schemes and other regulatory schemes that do not involve price-fixing. Auto insurance competes vigorously for a customer's business. Life insurance companies, other companies compete vigorously. The mere fact that there's a rate- I don't remember the nature of the risk and the actuarial ambivalences there. The nature of the risk here, and you make the argument, and you use that point, I think, to structure your argument, this is not really the business of insurance. But the risk here is very, very different from the kinds of risks that you're talking about. Exactly. Let me speak to that. The first point is rating bureaus exist, but not always exist within the context of price-fixing. The activity is the key here. If the defendants walked into a room with a box of documents that had the actuarial analysis, the statistical data that insurance companies need, that McCarron Ferguson says is necessary for them to share, and they never opened the box, and they sat around the table, and they said, we're going to double the price of our insurance policies, and never discussed anything in that box, it is not the business of insurance, even if it's an insurance product, and even if it spreads risk. But nobody would know if they did that. Right. Well, we know, though, because we had in FTC v. Tycor an extensive record, and we had fact findings that were made in 1986, but in this stage of the litigation, 12b-6, without discovery, it is clearly a well-pleaded allegation that there is no risk spreading. We know from FTC v. Tycor. Well, but they admit in the complaints that there's risk spreading. There's some risk spreading. Maybe not a lot, but there's some, and the fact that there's some is enough. There's no risk spreading involved in the activity that we're complaining of. Your dissent in Owens, then Judge Alito's. Elaborate on what you just said, the activity you're complaining of, because you're complaining about the rate, and as part of that complaint you're basically saying that the rate is driven in part by these side deals, but your focus is on the rate, the injunction is aimed squarely at the rate. Now, you're saying there's no risk taking in the rate? What I'm saying is this. The activity is when the defendants walk into the room and don't open the box of statistical actuarial underwriting data, and they agree we want to double the price of insurance, and that's all they do. That activity is not the business of insurance, and that's the activity that we have framed in our complaint. It has nothing to do with what McCarran-Ferguson's purpose is. This is just pure and simple price fixing, and if you look at their 2008 submission, it's in the record. They referenced it. They don't always get what they ask for in the only submission in the class period. What they did in 2008, they submitted an application. They said that there were two rates, a standard rate for an owner's policy and a lower rate for a mortgage policy. We want to combine those two rates into one. We're going to lower the rate for the owner's policy. We're going to increase the rate for the mortgagee policy. They, 40 days later, get an approval. We all know what happened in 2008. The real estate market crashes. No one is getting owner's policies. So they, in a rubber stamp, very neatly gave themselves an increase for the mortgagee policy. Putting aside their motivation, my point I want to make here is when they made that application, it's in A160 to A170, you could read it 10 times over and not see one iota of evidence in there that there's anything having to do with insurance. They just wanted to combine two rates into one, and they wanted to raise their mortgage rate to take advantage of the fact that interest rates are falling to historic lows, and they were able to pocket the fact that everybody who could was able to refinance. Have you tried interesting the legislature in your problem? I'm very bad at interesting the legislature in anything. I haven't. But, you know, the point is this. Are there other avenues available to anyone in the scheme of life, in the scheme of litigation? Of course there are. But we're here because we don't believe McCarran-Ferguson applies. And real quickly, because I have 27 seconds, the file rate doctrine is not a complete limitation on this action. There are cases after cases, including Square D, that says that all file rate is is an exemption, and all it prevents is a treble damages private action. Injunctive relief is entirely appropriate here. Eight seconds to go. Thank you very much. Thank you. Thank you.